**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

        Plaintiff,

v.

Stuart Alan Voigt (2),

        Defendant.

**Criminal No. 13-35 (PJS/SER)**

**REPORT AND RECOMMENDATION**

---

    Kimberly A. Svendsen, Esq., United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

    Robert M. Lewis, Esq., United States Attorney's Office, Saint Paul, Minnesota, for Plaintiff.

    Andrew S. Birrell, Esq., Gaskins Bennett Birrell Schupp, LLP, Minneapolis, Minnesota, for Defendant.

    Joseph S. Friedberg, Esq., Joseph S. Friedberg, Chartered, Minneapolis, Minnesota, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

    The above-captioned case comes before the undersigned on Defendant Stuart Alan Voigt's ("Voigt") Motion to Suppress Statements ("Motion to Suppress") [Doc. No. 82]. This matter was referred for the resolution of the issues raised in Voigt's Motion to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motion to Suppress be denied.

**I.     BACKGROUND**

    On April 15, 2015, a grand jury indicted Voigt with four counts of mail fraud in violation of 18 U.S.C. § 1341, two counts of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, sixteen counts of monetary transactions in criminally derived property in violation of 18

U.S.C. § 1957, five counts of bank fraud in violation of 18 U.S.C. § 1344, seven counts of false statements in a loan application in violation of 18 U.S.C. § 1014, and two counts of false statements to the Federal Deposition Insurance Corporation ("FDIC") in violation of 18 U.S.C. § 1007. (Superseding Indictment) [Doc. No. 54].

The Court held a motions hearing on October 5, 2015, where the Court received testimony from Special Agent Todd Jourdan ("Agent Jourdan") and Special Agent Daniel Harris ("Agent Harris"). (Ex. & Witness List) [Doc. No. 98]; (Am. Minute Entry Dated Oct. 5, 2015) [Doc. No. 99]. Supplemental briefing was submitted with a final brief filed on October 25, 2015. Following letters from the parties, the Court held a telephone status conference to discuss whether the hearing needed to be reopened to provide Voigt with an opportunity to object to exhibits Plaintiff the United States of America (the "Government") included in its supplemental brief. *See* (Minute Entry Dated Oct. 30, 2015) [Doc. No. 111]. Voigt's counsel clarified that he objected to Exhibit A, Agent Jourdan's Memorandum of Interview, because it was cumulative. (*Id.*). Voigt's counsel stated—although he believed them to be irrelevant—that for the purpose of determining the Motion to Suppress, he did not object to (1) Exhibit B: the December 20, 2011 Petition for Order of Removal and Prohibition and Order to Pay Civil Monetary Penalty; or (2) Exhibit C: FDIC–OIG subpoena to the regional counsel and/or custodian of records for the FDIC. (*Id.*). Finally, Voigt's counsel stated that he had no objection to Exhibit D—the target letter. (*Id.*). The Court took the Motion to Suppress under advisement on October 30, 2015. (*Id.*).

The trial in this matter is scheduled for January 25, 2016, before the Honorable Patrick J. Schiltz. (Am. Minute Entry Dated Oct. 5, 2015).

## II.     FACTS[1]

### A.     Agent Jourdan's Testimony

Agent Jourdan works for the FDIC's Office of the Inspector General ("OIG"). (Tr. at 8); *see* (*id.* at 30). Agent Jourdan and Agent Harris interviewed Voigt on February 16, 2012, and did not advise Voigt they were coming to his home. (*Id.* at 8–9, 17). Before the interview, Agents Jourdan and Harris picked up a target letter from the Assistant U.S. Attorney, which states that Voigt is the target of a federal investigation and advises the target to get a lawyer.[2] (*Id.* at 9, 18).

When the agents first arrived and knocked on Voigt's door, no one answered. (*Id.* at 9–10). They waited for a short time, and Voigt arrived home in his car. (*Id.* at 10). The agents approached Voigt, introduced themselves, and showed Voigt their credentials. (*Id.* at 10, 21–22, 26). They explained that they wanted to talk to him about a criminal investigation for the FDIC and asked if he was willing to talk to them. (*Id.* at 10, 21). Agent Jourdan testified that he usually says he is a special agent with the FDIC and that he is a criminal investigator. (*Id.* at 21). He could not remember, however, what specific words he used introducing himself to Voigt. (*Id.*). The agents told Voigt the interview was voluntary. (*Id.* at 21–22, 26). Voigt agreed to be interviewed and invited the agents to the lower level of his home. (*Id.* at 10).

The agents asked Voigt if he was represented "in any type of criminal matter as it relates to Hennessey Financial." (*Id.* at 23). Voigt said that he was represented by two attorneys, Phillip Cole ("Cole") and Bryan Feldhaus ("Feldhaus"), who helped prepare personal financial statements submitted to the FDIC. (*Id.* at 24); *see also* (*id.* at 40). Agent Jourdan testified that it

---

[1]     The facts in this section are drawn from the testimony at the hearing. (Tr. of Mots. Hr'g, "Tr.") [Doc. No. 103]. The Court only summarizes those facts that are pertinent to the instant Motion to Suppress.
[2]     *See* (Ex. D, Attached to Gov't's Resp. to Def.'s Post-Hr'g Mem. in Supp. of Mot. to Suppress, "Mem. in Opp'n") [Doc. No. 108-4] (providing instructions "[i]f you retain counsel" or "[i]f you cannot afford an attorney").

3

was his understanding that Voigt explained "that Mr. Cole and Mr. Feldhaus represented him in connection with this FDIC matter." (*Id*. at 24). The agents did not call Cole or Feldhaus at any point. (*Id*.). Agent Jourdan testified that the OIG for the FDIC is separate from the FDIC. (*Id*. at 30). The OIG oversees the FDIC and its operations. (*Id*.). Therefore, according to Agent Jourdan, the civil matter for which Voigt was represented was a matter related to the regulatory authority of the FDIC, and was not the same as the criminal investigation. (*Id*.). The agents showed Voigt personal financial statements that he submitted to the FDIC and Traditions Capital Bank. (*Id*. at 12–13). The agents wanted to ask Voigt to address the discrepancies between what he reported to each entity. (*Id*.); *see also* (*id*. at 21–22, 23). Specifically, one of the documents the agents discussed with Voigt "was generated in [the] civil matter." (*Id*. at 30–31). When the FDIC identified these inconsistencies, they notified Agent Jourdan's office. (*Id*. at 31).

During the interview, which lasted between one and two hours, Agent Jourdan was armed but his weapon was concealed, and the agents did not discuss whether they were armed in Voigt's presence. (*Id*. at 11–12). Both officers were in plain clothes. (*Id*. at 22). The agents did not plan to arrest Voigt, and, at the end of the interview, did not arrest Voigt. (*Id*. at 12). Voigt did not ask the agents to leave and did not appear to be under duress or stress. (*Id*.). Agent Jourdan testified that if Voigt had asked the agents to leave, they would have left. (*Id*. at 13). He appeared to understand the agents' questions and responded to them. (*Id*. at 12). The agents did not restrict Voigt's movement within the house, handcuff him, or give him a *Miranda* warning. (*Id*. at 13, 15).

The agents gave Voigt the target letter at the end of the interview. (*Id*. at 13). Agent Jourdan testified that he gave Voigt the target letter at the end of the interview because usually, if they provide the target letter at the beginning of the interview, people sometimes tell the agents

to leave. (*Id*. at 19). In other words, Agent Jourdan testified that giving someone a target letter at the **end** of the interview is the "best practice to get [the target] to talk." (*Id*.). Agent Jourdan did not recall whether Voigt read the letter in his presence or whether any additional conversations took place after Voigt received the target letter. (*Id*. at 27).

The interview was not recorded, and Agent Jourdan testified that he did not know whether the FDIC has written policies about recording interviews. (*Id*. at 15–16). Agent Jourdan took notes during the interview, which he eventually put into a memorandum. (*Id*. at 16, 29).

### B.  Agent Harris's Testimony

Agent Harris is an FBI agent who focused on investment fraud and mortgage fraud cases in 2012. (*Id*. at 33). Agent Harris first interviewed Voigt on September 24, 2009, with Postal Inspector Robert Strande. (*Id*.). The 2009 interview also took place at Voigt's house, but in the dining room. (*Id*. at 34). That interview also concerned Hennessey Financial. (*Id*. at 33–34). In 2009, Voigt did not have a "criminal attorney." (*Id*. at 42–43).

Because Voigt's case involved investment fraud, Agent Harris was involved and participated in Voigt's interview on February 16, 2012. (*Id*. at 33). Before the 2012 interview, Agent Harris and Agent Jourdan spoke on the phone about Cole's representation of Voigt "on the civil matter." *See* (*id*. at 42). Agent Jourdan explained to Agent Harris how the civil investigation compared to the criminal investigation. (*Id*.). Agent Harris's testimony with respect to the February 2012 interview largely mirrors that of Agent Jourdan's. *See, e.g.*, (*id*. at 35–36, 38, 40–41).

At the end of the February 16, 2012 interview, Agent Harris gave Voigt the target letter. (*Id*. at 37). Voigt read the letter in the agents' presence. (*Id*. at 37, 41, 44). Agent Harris told him the target letter came from an Assistant U.S. Attorney, and told him if he had any questions, he

5

could contact the Assistant U.S. Attorney, or consider reaching out to an attorney if he did not already have one. (*Id*. at 37–38, 42).

Agent Harris did not prepare a summary of the interview because he reviewed a draft of Agent Jourdan's notes and found it included the same information he would have included in a report. *See* (*id.* at 37). Agent Harris testified that it is "very common" for only one agent to write a memorandum when two agencies are cooperating on an interview. (*Id*.).

## III.   DISCUSSION

Voigt initially argued in his Motion to Suppress that statements made during the February 16, 2012 interview were taken in violation of *Miranda* because he was in custody and did not receive a *Miranda* warning.[3] (Voigt's Prehr'g Mem. of Law in Supp. of His Mot. to Suppress) [Doc. No. 83 at 2–4]. Voigt also argued that his statements were not voluntary. (*Id.* at 4). Voigt noted that the issues to be litigated with respect to this motion were "custody and voluntariness." (*Id.* at 2); *see also* (Summary of Conf. Between Counsel) [Doc. No. 88 at 2]. At the conclusion of the hearing, the Court instructed the parties that it would only consider the issues raised in the parties' post-hearing briefs. (Tr. at 49). Voigt's post-hearing briefing, however, addresses neither custody nor voluntariness. *See* (Voigt's Post-Hr'g Mem. of Law in Supp. of His Mot. to Suppress, "Mem. in Supp.") [Doc. No. 104]. Instead, Voigt argues the agents' interview constituted a violation of Minnesota Rule of Professional Conduct 4.2 ("Rule 4.2") that "went beyond the appropriate and commonly accepted investigatory activity of police and implicated issues relating to the fair administration of justice." (*Id.* at 12). Thus, Voigt asks the Court to exercise "its supervisory powers over the administration of justice and suppress the statements." (*Id.*).

---

[3]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

In spite of Voigt's current argument, the Court notes that neither the Fifth Amendment nor Sixth Amendment is implicated here. The Fifth Amendment right to counsel attaches when a person is subject to a custodial interrogation. *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983) (citing *Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981); *Miranda v. Arizona*, 384 U.S. 436, 467–70 (1966)). Here, Voigt was not in custody, and therefore, his Fifth Amendment right to counsel is not implicated. The Sixth Amendment right to counsel attaches when "adversarial judicial proceedings have been initiated." *Id.* (citing *Kirby v. Illinois*, 406 U.S. 682, 688–89 (1972); *United States v. Surridge*, 687 F.2d 250, 253 (8th Cir. 1982)). Because Voigt had not been indicted at the time of the interview, he therefore did not have a Sixth Amendment right to counsel.

The Government points out the change in Voigt's position—from a constitutional argument to the Rule 4.2 violation—was not raised in Voigt's pre-hearing filings, nor in the parties' meet-and-confer discussions, and therefore, "the record is scant." (Mem. in Opp'n at 1–3). As discussed above, the Government submitted additional exhibits to the Court to supplement the record.[4] (*Id.* at 3 n.1); (Minute Entry Dated Oct. 30, 2015). In addition, the Court provided an opportunity for the Government to reopen the criminal motions hearing, and the Government declined. (*Id.*). Therefore, while the Court understands the Government's surprise by the grounds upon which Voigt now seeks suppression of the statements, the Court considers any issue regarding such surprise resolved. The Government has thoroughly responded to Voigt's new argument regarding the rule violation, and declined the opportunity to present additional evidence beyond that submitted in conjunction with its responsive memorandum.

---

[4] Voigt objects only to the inclusion of Exhibit A, Agent Jourdan's interview report. (Minute Entry Dated Oct. 30, 2015).

Although constitutional matters are no longer at issue, the Court will nevertheless examine whether the Government violated Rule 4.2, and if so, whether such a violation merits suppression of statements in federal court. *See United States v. Beliveau*, Crim. No. 09-304 (JMR/JJK), 2010 WL 681257, at *4–5 (D. Minn. Feb. 23, 2010) (Rosenbaum, J., adopting the report and recommendation of Keyes, Mag. J.) (considering Rule 4.2 in the context of a motion to suppress); *United States v. Petters*, Criminal No. 08-364(1) (RHK/AJB), 2009 WL 1519888, at *9 (D. Minn. Apr. 28, 2009) (Boylan, Mag. J.), *adopted by* 2009 WL 1684414 (June 11, 2009) (Kyle, J.) (same).

    **A.**    **Legal Standard**

Rule 4.2 prohibits a lawyer from communicating with a person who is represented by counsel about the subject for which the person is represented. Minn. R. Prof'l Conduct 4.2. The rule provides three exceptions: (1) the lawyer has consent of the represented person's lawyer, (2) the lawyer is authorized by law to contact the represented person, or (3) the lawyer is authorized by a court order to contact the represented person. *Id.* The lawyer may not make a prohibited communication "through the acts of another." *Id.*, cmt. 4. "The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed." *Id.*, cmt. 8. This knowledge "may be inferred from the circumstances." *Id.* A communication "authorized by law" may include the investigative activities of government entities, either directly or through investigative agents, "prior to the commencement of criminal or civil enforcement proceedings." *Id.*, cmt. 5.

The Minnesota Rules of Professional Conduct apply to federal government attorneys through a federal statute and the operation of this District's Local Rules. 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules, and local Federal

court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."); 28 C.F.R. § 77.1(b) ("Section 530B requires Department [of Justice] attorneys to comply with state and local federal court rules of professional responsibility, but should not be construed in any way to alter federal substantive, procedural, or evidentiary law or to interfere with the Attorney General's authority to send Department attorneys into any court in the United States."); D. Minn. L.R. 83.6(a).

Additionally, "the interpretation of state disciplinary rules as they apply to federal criminal law practice should be and is a matter of federal law." *United States v. Plumley*, 207 F.3d 1086, 1095 (8th Cir. 2000). At the time the conduct at issue took place in *Plumley*, § 530B had not been enacted, and the Eight Circuit expressed no opinion on whether § 503B would affect its jurisprudence. 207 F.3d at 1095 ("Although this statute may inform our approach to future cases such as this, we need not consider it here because it did not become effective until April 21, 1999, well after the June 9, 1998 contact between Kaune and Bricko.").

Although the Eighth Circuit has not addressed the issue since *Plumley*, this District has considered whether Rule 4.2 was violated in the context of a criminal defendant's motion to suppress.[5] But even if a violation of Rule 4.2 is found, suppression may not be warranted. *See Beliveau*, 2010 WL 681257, at *5.

**B.   Analysis**

Voigt argues Agents Jourdan and Harris knew Voigt had a lawyer and interviewed Voigt at the direction of Assistant U. S. Attorney Robert Lewis ("Lewis"). (Mem. in Supp. at 10).

---

5     *See Beliveau*, 2010 WL 681257, at *4–5; *Petters*, 2009 WL 1519888, at *9; *but see United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999) (concluding § 530B does not govern the admissibility of evidence in federal court).

Thus, Lewis "approved and ratified this conduct." (*Id.* at 12). Voigt argues that because the agents knew Voigt had a lawyer with respect to the FDIC civil investigation, the agents created a "false dichotomy" between the civil and criminal investigations, and intended to separate Voigt from his lawyers. (*Id.* at 11). The Court agrees that the agents did not contact Voigt's known counsel, did not encourage Voigt to do so, and waited until the end of the interview to give Voigt the target letter suggesting that Voigt needed counsel.[6] Nonetheless, the agents' tactics appear to be accepted within the Eighth Circuit, and their conduct does not rise to the level of a constitutional violation because Voigt was neither in custody nor indicted as discussed above. The Court therefore analyzes whether Rule 4.2 was violated, and if so, whether suppression is warranted.

The Eighth Circuit examined whether law enforcement officers violated Rule 4.2—or a substantially similar rule—in two cases that are instructive to the Court's analysis.[7] The Eighth Circuit held that Rule 4.2's predecessor, Disciplinary Rule 7-104(A)(1), "does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel."[8] *Dobbs*, 711 F.2d at 86. In that case, Dobbs retained a lawyer when an FBI agent sought to interview him in August 1981 regarding threats a bank

---

[6] *See* (Ex. D) ("If you retain counsel, please have your attorney contact me").

[7] The Eighth Circuit decided both of these cases before 28 U.S.C. § 530B(a) was enacted. *Plumley*, 207 F.3d at 1095 ("Although [28 U.S.C. § 530B] may inform our approach to future cases such as this, we need not consider it here because it did not become effective until April 21, 1999, well after the June 9, 1998, contact between Kaune and Bricko."); *United States v. Dobbs*, 711 F.2d 84 (8th Cir. 1983). The Court relies on these cases for their analysis of whether conduct violates Rule 4.2 or a similar rule, rather than whether suppression is warranted for any such conduct.

[8] Minnesota's Disciplinary Rule 7-104(A)(1) stated "During the course of his representation a lawyer shall not[] . . . [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." *Dobbs*, 711 F.2d at 86.

10

...

president received via a handwritten letter. *Id.* at 85. Dobbs retained another lawyer when he testified before a grand jury in November 1981 and when a district court ordered him to provide handwriting exemplars. *Id*. When the same FBI agent interviewed Dobbs in July 1982 and informed him that an FBI report concluded he wrote the extortion letters, Dobbs agreed to speak with the agent and asked to be taken to a municipal building. *Id.* The agent read Dobbs his rights, and Dobbs stated that he understood them and signed a waiver form. *Id.* Dobbs then "made oral and written statements confessing to the extortion offense." *Id.* The Court found that Rule 4.2 "does not require the government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously retained counsel," and concluded the "noncustodial interview of Dobbs prior to the initiation of judicial proceedings against [Dobbs] did not constitute an ethical breach." *Id.* at 86.

The Eighth Circuit maintained a similar position in *Plumley*. In that case, codefendant Jeremy Kaune ("Kaune") testified before a grand jury that he had a lawyer on September 10, 1997, when he was questioned about a motorcycle theft. *Plumley*, 207 F.3d at 1094–96. On June 9, 1998, an FBI agent contacted him on behalf of the U. S. Attorney's office to recommend that Kaune obtain counsel regarding the motorcycle theft. *See id.* at 1089. Kaune then told the FBI agent to check his "work records to confirm that he could have not been involved in the motorcycle theft" that was the subject of the FBI investigation. *Id*. Kaune's work records, however, proved that his alibi was false. *Id.* at 1090. Kaune was convicted of conspiring to transport a stolen vehicle and making a false statement to an investigator. *Id.* Relying on *Dobbs*, the Eighth Circuit found that Kaune's argument that the district court should have suppressed his

statement to the FBI agent as a violation of Iowa Rule of Professional Responsibility DR 7-104(A)(1) was foreclosed by its precedent.[9] *Id.* at 1095.

Under both *Dobbs* and *Plumley*, the agents' interview of Voigt did not violate Rule 4.2. The parties do not dispute that Voigt was not indicted at the time of the interview. As in *Dobbs* and *Plumley*, Voigt retained a lawyer that the investigators knew about. (Tr. at 42). In *Plumley*, the government attorney was aware of the investigator's contact with the defendant. 207 F.3d at 1089. Thus, although Voigt argues that Lewis "approved and ratified" the agents' conduct while Lewis disclaims knowing that Voigt was represented, we need not resolve this dispute. (Mem. in Supp. at 12) (stating that Lewis "approved and ratified" the agents' interview of Voigt even though the agents knew Voigt was represented with respect to the civil FDIC investigation); (Mem. in Opp'n at 7) (stating that Voigt "has not shown that the prosecutor knew Voigt to be represented for any purpose, much less for the criminal investigation, [and therefore] the rule does not apply to the interview and cannot require suppression of any statement"). Under *Plumley*, even if Lewis knew that Voigt was represented, the agents were permitted to interview him. *See* 207 F.3d at 1089.

Finally, both *Dobbs* and *Plumley* permit an investigative agent to contact a represented person even when the scope of the representation is the same subject as the investigation. *Plumley*, 207 F.3d at 1089–90; *Dobbs*, 711 F.2d at 85. The Court agrees with Voigt that the distinction between the civil and criminal investigations is not very clear, arguably rendering the investigations the same "subject" for the purposes of Rule 4.2. *See* (Mem. in Supp. at 11). This is especially true because one of the issues discussed during the interview—for the purposes of the

---

[9] The Iowa Rule of Professional Responsibility at issue in *Plumley* was "substantively identical" to Minnesota's ethical rule DR 7-104(A)(1) at issue in *Dobbs*. *See Plumley*, 207 F.3d at 1095.

FDIC-OIG criminal investigation—was a document submitted to the FDIC that was part of the FDIC civil investigation. (Tr. at 41). Nonetheless, Eighth Circuit law permits law enforcement to contact a represented person about the same subject for which the person is represented. *Plumley*, 207 F.3d at 1089–90; *Dobbs*, 711 F.2d at 85. Therefore, even if there is no meaningful distinction between the civil and criminal FDIC investigations, Rule 4.2 does not prohibit the agents' interview. The Court concludes the agents' conduct was authorized by law and therefore, did not violate Rule 4.2.

Even if Rule 4.2 was violated, the Court declines to exercise "its supervisory powers over the administration of justice and suppress the statements." *See* (Mem. in Supp. at 12). Although arguably duplicative of this Court's Local Rules, 28 U.S.C. § 530B states that attorneys for the government must abide by state laws and rules as attorneys in that state. The parties do not appear to disputes that this law applies. But the law does not authorize the sanction Voigt seeks: suppression of statements where there was no constitutional violation. *See* (Mem. in Supp. at 12). In fact, the statute is silent with respect to any consequence that the Court should oppose. *See* 28 U.S.C. § 530B. Both this District and the Minnesota Supreme Court note that "'nearly every court that has ruled on [a no-contact rule violation in a criminal law context] has found that suppression of a [statement] is an inappropriate remedy for a lawyer's ethical violation.'" *Beliveau*, 2010 WL 681257, at *5 (quoting *State v. Clark*, 738 N.W.3d 316, 340 (Minn. 2007)) (alteration in original). Further, the Court agrees with the Eleventh Circuit that "a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible." *Lowery*, 166 F.3d at 1124. Nonetheless, the Court considers whether, even if there was a Rule 4.2 violation, the agents' conduct rises to the level of

egregiousness that led the Minnesota Supreme Court to suppress statements under the same rule in *State v. Miller*, 600 N.W.2d 457, 468 (Minn. 1999).

Here, the agents purposefully waited to give Voigt the target letter, notifying him that he was the "target of a federal criminal investigation." (*Id*. at Ex. D); *see* (Tr. at 13, 19). Agent Jourdan testified that this was the "best practice to get him to talk," because otherwise, the person may tell the agents to leave. (Tr. at 19).

Despite this troubling procedure, the Court cannot conclude that it rises to the level of egregiousness described in *Miller*, where the Minnesota Supreme Court suppressed statements when law enforcement officers, at the direction of a prosecutor, violated Rule 4.2. Defendant Robert Dale Miller ("Miller") worked for Burnsville Sanitary Landfill ("BSL"), which was being investigated based on a complaint that BLS "was giving certain waste haulers favorable waste disposal rates." *Id.* at 460–61. Dakota County assigned assistant Dakota County Attorney Jay Stassen ("Stassen") "to advise the county on the civil aspects of the investigation," and Assistant Dakota County Attorney Pat Skelly ("Skelly") "to consult with the civil investigators on possible criminal charges." *Id.* at 460. In December 1994, Stassen, the civil county attorney, met with an attorney from the office of Joe Dixon ("Dixon"), who represented BLS and its parent company, to discuss BSL procedures that were the subject of the Dakota County civil investigation. *Id.* "[T]he case was officially forwarded to the Dakota County Attorney's Office for criminal investigation on January 20, 1995." *Id.* A search warrant was executed at BLS on May 11, 1995, beginning at 8:45 a.m., and Miller arrived at 9:30 a.m. *Id.* at 461. Law enforcement officers provided Miller with the search warrant and told him he was not under arrest. *Id*. When a law enforcement officer asked to speak with Miller, Miller agreed but asked to speak to Dixon, his lawyer. *Id.* With the lead detective's permission, Miller faxed a copy of the search warrant to

Dixon. *Id.* Law enforcement interviewed Miller for forty minutes. *Id.* During that time, Dixon contacted law enforcement officers at the scene, told them he represented BSL and its employees, and "asked that no statements be taken from employees without him [Dixon] being present." *Id.* Law enforcement officers refused Dixon's request to speak with Miller, and refused to end Miller's interview or notify Miller that Dixon wanted to speak with him. *Id.* Skelly, the prosecutor, advised the lead detective that he did not need to end Miller's interview or allow Dixon on the premises. *Id.* Dixon arrived at the premises and was not permitted to enter the building or speak with any employees. *Id.* The lead detective did agree, however, that an employee who requested the presence of counsel would not be interviewed. *Id.*

The Minnesota Supreme Court found that the appropriate analysis for a Rule 4.2 violation "is to look at alleged violations on a case-by-case basis, examining the totality of the circumstances of the contact to determine if it went beyond appropriate and commonly accepted investigatory activity of police to implicate issues relating to the fair administration of justice on the part of the prosecuting attorney." *Id.* at 467. Additionally, the court interpreted Rule 4.2's "authorized by law" exception "to mean that legitimate investigative processes may go forward without violating [Rule] 4.2 even when the target of the investigation is represented by counsel, but when the process goes beyond fair and legitimate investigation and is so egregious that it impairs the fair administration of justice, it is not 'authorized by law.'" *Id.*

The court found that a change in the nature of the investigation from civil to criminal had no impact on Rule 4.2's applicability. *Id.* at 468. The court concluded Rule 4.2 was violated, and "the record reflect[ed] a systemic isolation of the client from his attorney by refusing to terminate the non-custodial interview despite the attorney's request and prohibiting the attorney from speaking with the client." *Id.* The court found the Dakota County Attorney's Office "at

least ratified if not directed" the conduct isolating Miler from his attorney, and Rule 4.2 "was violated because the prosecutor's conduct was sufficiently egregious to implicate concerns relating to the fair administration of justice. Therefore the 'authorized by law' exception to [Rule] 4.2 does not apply." *Id.* Finally, the court concluded that the sanction of suppression of statements made after Dixon requested that officers not interview Miller "appropriately reflect[ed] the seriousness of the ethical violation and the prejudice to [Miller]." *Id.*

Even if this Court applies the exclusionary rule in the same manner as the Minnesota Supreme Court, the agents' interview of Voigt was not as egregious as the conduct in *Miller*. *See Beliveau*, 2010 WL 681257, at *5 (conducting a similar analysis using *Miller*). The court in *Miller* was not persuaded by the distinction between the civil and criminal investigations. 600 N.W.2d at 468. But as stated above, even if there is no distinction, the contact is authorized under Eighth Circuit law. *See Plumley*, 207 F.3d at 1089–90; *Dobbs*, 711 F.2d at 85. Unlike in *Miller*, Voigt did not ask to call his attorneys or otherwise make contact with them before proceeding with the interview. Therefore, Voigt's interview does not represent a "systemic isolation of the client from his attorney." *See id.* at 468; *cf.* (Mem. in Supp. at 10).

For the foregoing reasons, the Court concludes that Agent Jourdan and Agent Harris's interview of Voigt was "authorized by law" under Minnesota Rule of Professional Conduct 4.2 as interpreted by the Eighth Circuit, and suppression of Voigt's statements is not warranted.[10]

---

[10] Because the Court does not rely on Exhibit A, Agent Jourdan's Memorandum of Interview, it need not discuss nor rule on Voigt's objections to that exhibit. *See* (Minute Entry Dated Oct. 30, 2015).

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Stuart Alan Voigt's Motion to Suppress Statements [Doc. No. 82] be **DENIED**.

Dated: November 24, 2015

                                                 *s/Steven E. Rau*
                                                 STEVEN E. RAU
                                                 United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.